UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHARLENE CHRISTOPHEL,       )
                                   )
        Plaintiff/Counter-Defendant,  )
                                   )
        v.                        )       CAUSE NO. 3:12-CV-082 JD
                                   )
CONTINENTAL CASUALTY       )
COMPANY,                        )
                                 )
        Defendant/Counter-Plaintiff.  )

## OPINION AND ORDER

Now before the Court are Defendant Continental Casualty Company's Motion for

Summary Judgment [DE 27] and Plaintiff Charlene Christophel's Motion for Summary

Judgment [DE 29] which are fully briefed [DE 28, 30, 31, 34, 35, 36, 40, 42]. Also before the

Court are Defendant Continental Casualty Company's Motion for Oral Argument [DE 37] and

Motion to Strike [DE 38], along with briefs in support and in opposition to the Motion to Strike

[DE 39, 41]. For the reasons below, the Court denies Continental's Motion to Strike [DE 38],

denies Continental's Motion for Summary Judgment [DE 27], grants Christophel's Motion for

Summary Judgment [DE 29], and denies Continental's Motion for Oral Argument [DE 37]. The

Court also strikes Continental's Counterclaim from the pleadings [DE 8 at 6-9].

## I.  BACKGROUND

This action was initiated with the filing of a Complaint for Declaratory Judgment [DE 1]

by Charlene Christophel ("Christophel") to determine the rights and relations of the parties under

the Long Term Care Insurance Policy ("Policy") [DE 31-4 at 6-18] issued by Continental

Casualty Company ("Continental"). The dispute presented concerns whether or not Evergreen Place is an "Alternate Care Facility" under the Policy.[1]

Continental is an insurance company incorporated under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois [DE 13 at 1]. Continental also does business in the State of Indiana. *Id.* Continental issued the Policy to Christophel through its Indiana Long Term Care Insurance Program, with an effective date of October 25, 2000. *Id.* at 2. The Policy contains coverage for "Qualified Long Term Care in a Facility" [DE 28-2 at 14], and a "Facility" is defined as either "A Long Term Care Facility; or An Alternate Care Facility." [DE 28-2 at 10].

On or about May 26, 2010, Christophel became a resident of Evergreen Place, which is registered with Indiana to provide housing with services, and is a division of Greencroft of Goshen, Inc. [DE 13 at 2; DE 31-1 at 1-2]. Greencroft of Goshen, Inc. is comprised of various divisions (or licensed and unlicensed facilities) located on the Greencroft Goshen campus in Goshen, Indiana, and constitutes the largest continuing care community in Indiana based on resident population [DE 31-1 at 1; DE 35 at 10 n. 1]. Further, Greencroft of Goshen, Inc. is registered with Indiana as a Continuing Care Retirement Community. *Id.* One of Greencroft's divisions, Greencroft at Home, is licensed as a Personal Services Agency under I.C. 16-27-4, and another of its divisions, Greencroft Healthcare, retains a Comprehensive Care License under I.C. 16-28-2 [DE 31-1 at 2-3]. The Greencroft divisions work together symbiotically; if a resident of

---

[1]Christophel's Complaint (and Continental's Counterclaim) only requests the Court to decide this narrow issue in this non-coercive declaratory action. And while other provisions in the Policy might affect coverage, such as, whether the care Charlene actually received is "Qualified Long Term Care" [DE 31-4 at 11]; whether Charlene Christophel has been "Chronically Ill" ever since she entered Evergreen Place [DE 31-4 at 9, 11]; and what, if any, pecuniary benefits Charlene is entitled to under the Policy [DE 31-4 at 15], the parties have not raised these or any other issues for the Court's determination.

Evergreen Place needed additional services, he or she could contract with the other divisions to receive further care [DE 31-1 at 1, 3].

When Christophel entered Evergreen Place, she was "Chronically Ill" and required "Qualified Long Term Care" as provided in the Policy [DE 13 at 3]. Christophel's daughter acquired additional services, including assistance with bathing and managing Christophel's medications, which were provided by employees from other Greencroft divisions at Evergreen Place [DE 30 at 21; DE 31-2 at 1-2]. Christophel sought benefits and timely met all of the notice requirements under the Policy [DE 13 at 5]. Continental has denied coverage and refused to pay the Daily Facility Benefits contained in the Policy, claiming that Evergreen Place is not a "Long Term Care Facility" or an "Alternate Care Facility" as defined in the Policy. *Id.* There is no dispute that Evergreen Place fails to meet the definition of a "Long Term Care Facility" [DE 27 at 1; DE 30 at 7]. However, Christophel claims that Evergreen Place is an "Alternate Care Facility" as defined in the Policy [DE 30 at 5]; a contention Continental denies [DE 13 at 5].

An "Alternate Care Facility" is defined as follows in the Policy:

**A facility** that is engaged primarily in providing ongoing care and related services to inpatients in **one location** and meets all of the following criteria:

1. **Provides 24 hour-a-day care and services sufficient to support needs resulting from inability to perform Activities of Daily Living or Cognitive Impairment;** and

2. Has a trained and ready to respond employee on duty at all times to provide that care; and

3. Provides 3 meals-a-day and accommodates special dietary needs; and

4. **Is licensed or accredited by the appropriate agency to provide such care, if such licensing or accreditation is required by the state in which the care is received;** and

5. Has formal arrangements for the services of a physician or nurse to furnish medical care in case of emergency; and

**6.    Has appropriate methods and procedures for handling and administering drugs and biologicals.**

These requirements are typically met by hospice care facilities or **assisted living facilities that are either free standing facilities or part of a life-care community**.  They may also be met by some personal care and adult congregate care facilities.  They are generally NOT met by individual homes or independent living units.

An Alternate Care Facility does not mean a Long Term Care Facility, hospital or clinic, boarding home, or a place which operates primarily for the treatment of alcoholics or drug addicts.

[DE 31-4 at 8] (emphasis added).  Continental admits in its Answer that Evergreen Place is "a facility that is engaged primarily in providing ongoing care and related services to inpatients in one location" [DE 13 at 4, ¶ 14], although for summary judgment purposes Continental contests the scope of the term "one location."  The parties do not dispute that Evergreen Place meets the second, third, and fifth criteria of the definition [DE 13 at 3-4 ¶¶ 16, 17, 20].  Thus, the first, fourth, and sixth criteria of this definition (as indicated in bold) are in dispute [DE 13 at 3-4, ¶¶ 15, 18, 21].

On January 13, 2012, Christophel filed her Complaint for Declaratory Judgment [DE 1] in the Elkhart Superior Court.  On February 13, 2012, Continental filed its Notice of Removal [DE 2] to federal court.  Continental then filed its First Amended Answer to Plaintiff's Complaint for Declaratory Judgment and Counterclaim [DE 13] on March 27, 2012, and its Motion for Summary Judgment [DE 27] on November 30, 2012.  Christophel also filed her Motion for Summary Judgment [DE 29] on November 30, 2012.  Finally, Continental filed its Motion for Oral Argument [DE 37] and its Motion to Strike [DE 38] on January 14, 2013.  The Court first addresses the Motion to Strike, then rules on the parties' Motions for Summary Judgment.

## II.    MOTION TO STRIKE

In ruling on the parties' summary judgment motion, the Court will consider the types of materials listed in Rule 56(c) and evidence that would be admissible if offered at trial. Fed. R. Civ. P. 56(e)(1); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986*); Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 371 n.6 (7th Cir. 1997) (declining to consider hearsay evidence in ruling on a motion for summary judgment); *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 365 n.14 (7th Cir. 1987) (refusing to consider inadmissible handwritten notes which were incomplete, unreliable, and riddled with hearsay in rendering a decision on a motion for summary judgment).

Any affidavit submitted for the court's consideration in ruling on a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). Absent evidence supported by specific facts, conclusory allegations are insufficient to defeat a motion for summary judgment. *Payne*, 337 F.3d at 773 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Moreover, a party generally may not "create an issue of fact by submitting an affidavit whose conclusions contradict [that party's own] prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996).

Although self-serving statements unsupported by evidence are insufficient to overcome a motion for summary judgment, *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001), the mere fact that an affidavit is self-serving does not preclude the court from considering it on summary judgment, as long as the affidavit meets the requirements of Rule 56(c). *See Payne*, 337 F.3d at 773 ("lay[ing] to rest the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion."). Additionally, "when considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Hogue v. City of Fort Wayne*, 599 F. Supp. 2d 1009, 1016 (N.D. Ind. 2009) (quoting *Paniaguas v. Aldon Cos., Inc.*, No. 2:04-CV-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006)).

Before proceeding directly to the merits of Continental's Motion to Strike, the Court must first consider Continental's argument that its Counterclaim allegations should be deemed admitted.

## A. The First Amended Counterclaim.

Continental asks the Court to deem admitted the factual allegations in its First Amended Counterclaim [DE 39 at 2]. In essence, because Christophel did not respond to Continental's Counterclaim [DE 13 at 7-9], Continental argues this failure to respond should render the Counterclaim allegations admitted. Ordinarily, a court deems a party's failure to respond to a claim as an admission. Fed. R. Civ. Pro. 8(b)(6); *Atkinson v. Atkinson*, 167 F.2d 793, 795 (7th Cir. 1948). However, the Court declines to deem these allegations admitted by reason of a failure to respond and instead strikes the First Amended Counterclaim along with its allegations.

The Court has the discretion to strike "any redundant . . . matter" from a pleading *sua sponte*. Fed. R. Civ. P. 12(f)(1). No motion is required of any party for the Court to strike a portion of the pleading, *Nunley v. Kloehn*, 158 F.R.D. 614, 618 (E.D. Wis. 1994) (court *sua sponte* struck portions of the amended complaint because it was redundant and added little to the other parts of the complaint), and no hearing is required prior to the Court's striking any portion of the pleading, *United States v. 416.81 Acres of Land*, 514 F.2d 627, 630 (7th Cir. 1975).

It is appropriate to strike Continental's Counterclaim in this instance because its allegations simply repeat Continental's responses contained in its Answer and Affirmative Defenses which were provided in the same document (immediately before the Counterclaim) [DE 13]. The substance of Continental's Counterclaim is that Christophel is not entitled to coverage under the Policy, the same Policy that constitutes the gravamen of both the Complaint and Answer in this case. Moreover, in its Counterclaim, Continental relies on the same provisions of the Policy, including the definition of "Alternate Care Facility," and Continental asserts facts which it originally denied in responding to the Complaint, including its argument that Evergreen Place is not an "Alternate Care Facility" and is not properly licensed under the laws of Indiana. *Compare* DE 13 at 1-6 *with* DE 13 at 7-9.

Allowing Continental's Counterclaim would turn Christophel's Complaint on its head. It would require Christophel to respond by simply reiterating her position, thereby resulting in needless redundancy and complication of the pleadings. Moreover, the only difference contained in the Counterclaim is Continental's request for costs, expenses, and attorney's fees from Christophel, a request which can be made by motion should Continental be deemed the prevailing party in accordance with Rule 54 and other applicable laws. There are no substantive

legal claims found in Continental's Counterclaim separate and apart from the responses it already provided in its Amended Answer [DE 13].

Finally, Christophel did not fail to deny anything in the Counterclaim because the allegations in Christophel's Complaint were sufficient to serve as a denial of the Counterclaim. Continental cannot make Christophel repeat, in negative form in a response, the allegations of her Complaint. Thus, the Court strikes Continental's Counterclaim as redundant pursuant to Rule 12(f).

### B. Defendant's Motion to Strike.

Continental argues against the admission of certain exhibits, Ms. Christophel's affidavit, and references to the Plan of Care. The Court finds these admissions harmless to the extent they were belatedly disclosed, and otherwise properly admitted. Therefore, for the reasons detailed below, the Court denies Continental's Motion to Strike.

### 1. Exhibits A-1, A-2, A-3, A-4, and A-6 and references made in the Plaintiff's Statements of Material Fact are admitted.

Continental argues against the admission of Exhibits A-1, A-2, A-3, A-4, and A-6 [DE 31-1] (collectively "Exhibits") and references made to the Exhibits located in Christophel's Statements of Material Facts ("SOMF") [DE 31 ¶¶ 10-13, 15, 18-19, 26-28] because Christophel failed to produce these Exhibits prior to the close of discovery [DE 39 at 3].[2] Continental cites Federal Rule of Civil Procedure 26(a) in support of its motion.

Federal Rule of Civil Procedure 26(a)(1) requires a party to provide certain initial disclosures to the other parties. In failing to provide proper disclosures, the Seventh Circuit has held that under Federal Rule of Civil Procedure 37(c)(1) "the sanction of exclusion is automatic

---

[2]Continental's alternative argument that Plaintiff's SOMF should be excluded to the extent it contradicts the allegations in Continental's Counterclaim is rejected as moot given the Court's ruling that the Counterclaim is stricken. *See supra* II, A.

and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado by Salgado v. GMC,* 150 F.3d 735, 742 (7th Cir. 1998) (citing *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir. 1996)).

"The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1363 (7th Cir. 1996). Delay of disclosure is harmless when it does not prejudice the opposing party. *See id.* (delayed disclosures were found harmless where they did not interfere with the other party's ability to prepare for a deposition or allow its expert to opine on the case). There are four factors which the district court may consider when determining whether or not a violation of Rule 26(a) is harmless: 1) the prejudice or surprise to the party against whom the evidence is offered; 2) the ability to cure the prejudice; 3) the likelihood of disrupting trial; and 4) bad faith or willfulness in failing to disclose earlier. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Continental does not allege any bad faith or willfulness with respect to Christophel's failure to disclose the Exhibits prior to the end of discovery, nor does the Court discern any such basis. Further, any prejudice to Continental in the delayed disclosure has been cured by the amount of time which has lapsed since Christophel's disclosure thereby allowing Continental to prepare an informed response to Christophel's Summary Judgment Motion and allowing Continental more than ample time to prepare for any trial (which has yet to be scheduled). Notably, while discovery has concluded, Continental has not requested additional time for discovery. Continental's conclusory allegation that delayed production axiomatically results in exclusion without specifying any basis indicating that the admission of the Exhibits would cause

any prejudice to its case is without merit. Because the delayed disclosure was harmless, the request to strike the evidence is denied.

Continental argues alternatively that the SOMF referencing the Exhibits "impl[y]" that Evergreen Place can administer or handle medication, or otherwise mischaracterizes the Exhibits' terms [DE 39 at 4]. Yet, what Continental overlooks is the fact that the Exhibits and their contents speak for themselves. Moreover, Continental attempts to blur the distinction readily discernable in the Exhibits and the SOMF. The Exhibits indicate the services typically provided by Evergreen Place at a set price, which as Continental suggests, does not include licensed nursing services or assistance with setting-up or dispensing medication. However, the SOMF relies on the affidavits of those with personal knowledge and competence to testify to the fact that additional services not normally provided at the set price can be purchased on an as needed basis. For instance, the affidavits (upon which the SOMF rests) indicate that residents of Evergreen Place can contract for additional nursing services which may in fact include the dispensing of medication. Thus, the Exhibits do not contradict the affidavits produced by Christophel. The Court finds no merit in Continental's misguided argument and declines to strike on this basis any of Christophel's Exhibits or references made to them in the SOMF.

### 2. Shirley Christophel's Affidavit is admitted as harmless and her statements are not hearsay under the Rules of Evidence.

Continental next argues the Court should strike the admission of Shirley Christophel's affidavit [DE 31-2], again contending Christophel's failure to disclose Shirley as a witness with knowledge of the facts violates Rule 26(a)(1). It also objects to Christophel's failure to provide a copy of the Plan of Care which Shirley Christophel relies on in her affidavit. The Court does not agree with Continental's position.

As mentioned, Rule 26(a)(1) requires a party to provide certain initial disclosures to the other parties, and the sanction of exclusion is automatic and mandatory unless the violation was either justified or harmless. *See* Rule 37(c)(1); *Salgado by Salgado,* 150 F.3d at 742 (citing *Finley,* 75 F.3d at 1230). Such a determination is left to the district court's discretion, *Mid-America Tablewares Inc.,* 100 F.3d at 1363, and when determining whether or not a violation of Rule 26(a) is harmless the court considers the factors previously noted in *David v. Caterpillar, Inc.*, 324 F.3d at 857.

By way of background, the Court notes that Shirley Christophel is Plaintiff Charlene Christophel's daughter and power of attorney [DE 31-2 at 2]. In any event, for Continental to suggest it was prejudiced by the failure to disclose Shirley as a witness with knowledge of the issues raised in the case is without merit; Continental wrote Shirley a letter dated November 1, 2010 (over a year before the Complaint was ever filed), indicating that Continental was denying coverage under the Policy for her mother's care at Evergreen Place because the facility did not meet the definition of an Alternate Care Facility [DE 41-1 at 30-31].

And while Christophel should have formally disclosed Shirley's name on the list of witnesses and informed Continental of her knowledge of the facts, there is no evidence to indicate any bad faith or willfulness on the part of Christophel. Additionally, Continental has not explained how the admission of Shirley Christophel's affidavit would actually or potentially prejudice its case or disrupt these proceedings. In fact, any prejudice has been cured by the amount of time Continental has known about Shirley's involvement and the time Continental has had to respond to Shirley Christophel's affidavit. And any argument to strike the Plan of Care mentioned in Shirley Christophel's affidavit is rejected for these same reasons. Despite the delay in disclosure, Continental has had ample opportunity to respond to the evidence for purposes of

the pending summary judgment motions (and will have even more time to respond prior to any trial), and there is no prejudice to Continental in admitting the entirety of Shirley's affidavit.

Continental alternatively argues that Shirley's statements which discuss Dr. Buller's recommendations and the Plan of Care are hearsay and not based on personal knowledge, and are thus inadmissible under Rules 701 and 802 [DE 39 at 4]. Christophel maintains the statements are not hearsay because they are not admitted for the truth of the matter asserted, but for the effect on the listener [DE 41 at 8-9].

First, there is no merit in the argument that Shirley lacks personal knowledge of the assertions contained in her affidavit [DE 31-2]. Shirley was the daughter and power of attorney of Charlene Christophel when Charlene was placed in Evergreen Place. Shirley was responsible for completing the requisite forms to obtain care for Charlene at Evergreen Place, including the Plan of Care form filled out and returned by Charlene's doctor, Dr. Buller, which recommended the level of assistance Charlene needed. Clearly, Shirley has particularized knowledge of these facts given her personal involvement and supervision of the process necessary to secure her mother's care.

Concerning Continental's hearsay argument, it is true that out of court statements made for the truth of the matter asserted are hearsay, Fed. R. Evid. 801(c), and are generally inadmissible unless another rule applies providing for its admission, Fed. R. Evid. 802. However, if the statement is not made for the truth of the matter asserted, it may be admissible because it is not hearsay by definition. For instance, statements asserted for the effect on the listener's state of mind are not hearsay and are admissible. *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993).

The Court finds that Shirley Christophel's statements about the Plan of Care could be made for simply showing the effect on the listener, that is, why Shirley pursued certain services. Thus, to the extent relevant, her statements are admissible for this non-hearsay purpose. The statements discussing the Plan of Care explain Dr. Buller's diagnosis of Charlene's condition and his recommendations for her treatment. Dr. Buller specifically indicated that Charlene needed assistance that would include help with bathing and taking medication. It is unnecessary to take the statements for the truth of the matter to understand Shirley's state of mind in signing Charlene up for certain services at Evergreen Place. Thus, Dr. Buller's statements could be admitted in a limited manner, not for the truthfulness of his statements, but for the effect they had on Shirley, thereby causing her to contract certain additional services for her mother.

Frankly however, for purposes of the present inquiry, the statements attributed to Dr. Buller in the affidavit have little significance and are not relied upon herein for their truth. As previously mentioned, *see supra* p. 2, fn. 1, whether or not Charlene actually received "Qualified Long Term Care" (which requires care necessitated by a "Chronically Ill" individual pursuant to a prescribed "Plan of Care") [DE 31-4 at 11], is not an issue raised in this action for the Court's determination. So while Dr. Buller's assessment and Plan of Care might ultimately matter, thereby requiring an affidavit from the doctor himself, it is not relevant to the issue addressed herein—whether or not Evergreen Place meets the Policy's definition of Alternate Care Facility. And Shirley need not rely on any assessment made by Dr. Buller in order to provide a first hand account of the services she acquired for Charlene while Charlene resided at Evergreen Place.

Because Shirley Christophel's affidavit does not fail on any of the arguments presented by Continental, the affidavit is admissible, and it is unnecessary to strike any references to

Shirley's statements located in the SOMF. Accordingly, the Court denies Continental's Motion to Strike.

### III. SUMMARY JUDGMENT STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Kerri v. Bd. Of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* On the other hand, where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in its favor. *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

Finally, the fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Ind. Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are treated separately under the standards applicable to each. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). This case is no exception.

## IV.    CROSS MOTIONS FOR SUMMARY JUDGMENT

The parties do not raise a choice of law issue (and in fact rely on Indiana law in their briefs [DE 30 at 13; DE 28 at 5]) and therefore the Court applies federal procedural law and Indiana state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010) (applying the law of the forum state because no party raised a choice of law issue) (citing *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 531 (7th Cir. 1985).  Contract interpretation is a substantive issue, *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998); thus, Indiana state law applies to the issues presented in this case.

In Indiana, insurance policies are governed by the same rules of construction as other contracts, and their interpretation is a question of law. *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009).  When interpreting an insurance policy, the court's goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009), *trans. denied*.  If insurance policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E. 2d 770, 771 (Ind. 2008) (quoting *Cabanaw v. Cabanaw*, 648 N.E.2d 694, 697 (Ind. Ct. App. 1995)); *see also Sell v. United Farm Bureau Fam. Life Ins. Co.*, 647 N.E.2d 1129, 1132 (Ind. Ct. App. 1995).  The court may not extend insurance coverage beyond that provided in the contract, nor may the court rewrite the clear and unambiguous

language of the insurance contract. *Am. States Ins. v. Adair Indus.*, 576 N.E.2d 1272, 1273 (Ind. Ct. App. 1991).

Where there is ambiguity, insurance agreements are strictly construed against the insurance company to further the general purpose of providing coverage. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992); *see also Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1101 (Ind. Ct. App. 1997). An insurance contract is ambiguous when "it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Sans*, 676 N.E.2d at 1101. A contract is not ambiguous merely because there is disagreement between the parties over the meaning of the terms. *Everett Cash Mut. Ins. Co. v. Taylor*, 926 N.E.2d 1008, 1013 (Ind. 2010). Usually the interpretation of an insurance policy, even an ambiguous policy, is a question of law appropriate for summary judgment. *Smock v. Am. Equity Ins. Co.*, 748 N.E.2d 432, 435 (Ind. Ct. App. 2001).

In determining whether Christophel is entitled to coverage under the Policy, the Court must decide whether or not Evergreen Place is an "Alternate Care Facility." There are six elements that must be considered in order to determine whether a facility is an Alternate Care Facility; however, only three elements are in dispute and need be discussed: 1) whether Evergreen Place "provides 24 hour-a-day care and services sufficient to support needs resulting from inability to perform Activities of Daily Living or Cognitive Impairment"; 2) whether Evergreen Place "[i]s licensed or accredited by the appropriate agency to provide such care, if such licensing or accreditation is required by the state in which the care is received"; and 3) whether Evergreen Place "[h]as appropriate methods and procedures for handling and administering drugs and biologicals." [DE 31 at 35].

There is also a dispute concerning the scope of the term "one location" as used in the Policy.[3]  Continental seemingly argues "one location" means only Evergreen Place [DE 35 at 10-11], whereas Christophel contends "one location" is broader and includes the whole of Greencroft of Goshen, Inc. (herein "Greencroft"), which necessarily includes the division known as Evergreen Place [DE 30 at 19].  Although the distinction makes no difference to the outcome, the Court considers this threshold issue prior to discussing the three contested elements of "Alternate Care Facility."

A.    **The scope of the facility.**

In this case, the Policy explicitly states that an "Alternate Care Facility" is "[a] facility that is engaged primarily in *providing ongoing care and related services to inpatients in one location* and meets all of the following criteria: . . . . These requirements are typically met by . . . assisted living facilities that are either *free standing facilities or part of a life-care community*." [DE 31-4 at 8] (emphasis added).  The affidavit of Greencroft's CEO establishes that Evergreen Place is part of a larger campus owned by Greencroft [DE 30 at 19; DE 31-1 at 1].  In fact, the Evergreen Place attendants, who provide Evergreen Place residents their daily support services, are employees of and paid by Greencroft [DE 31-1 at 1-2].

Continental argues the scope of the Policy's term "one location" [DE 31 at 35] is limited to Evergreen Place [DE 35 at 10-11] because including the whole of Greencroft undermines the Policy's requirement of "one location." *Id.*  However, Continental does not dispute that Greencroft is in fact a "life-care community" which Evergreen Place is part of [DE 35 at 12].

The Court has no reason to disagree with Continental.  The text of the Policy clearly and unambiguously refers to "a facility" that provides services to patients in "one location" that may

---

[3]As previously noted, the Policy requires "[a] facility that is engaged primarily in providing ongoing care and related services to inpatients in *one location*" [DE 31-4 at 8] (emphasis added) and meets the remaining listed criteria.

be part of a "life-care community." Here, Evergreen Place meets that definition. In other words, it is a facility that provides ongoing care to inpatients in one location, and happens to be a part of the larger life-care community known as Greencroft. Importantly, the Policy only requires that the inpatients receive their care at Evergreen Place (that is, the relevant "one location"), which they do. Moreover, the Policy does not exclude coverage for an insured that happens to contract with other facilities to provide additional care while staying at Evergreen Place.

Thus, the subsequent disputed elements will be analyzed through the lens of the Evergreen Place "location," in order to address Continental's argument that Evergreen Place itself does not qualify as an Alternate Care Facility even if it is part of a life-care community because the remaining elements required of an Alternate Care Facility are not met.

B.      Care supporting of daily living needs.

Christophel contends that Evergreen Place meets the first element of Alternate Care Facility because the staff provides the kind of twenty-four hour a day support for the inability to perform Activities of Daily Living as required by the Policy. The only position taken by Continental on the matter is located in its Answer which offers only a general denial of Christophel's contention [DE 13 at 4].

In order to meet the first element of Alternate Care Facility in the Policy, the facility (that is, Evergreen Place) must provide "24 hour-a-day care and services sufficient to support needs resulting from inability to perform Activities of Daily Living or Cognitive Impairment." [DE 31-4 at 8]. Christophel focuses on the fact that Evergreen Place is a facility that provides support for the inability to perform Activities of Daily Living, rather than care for Cognitive Impairment. And according to the text of the Policy, Activities of Daily Living include eating, dressing, bathing, toileting, transferring into or out of beds and chairs, and continence. *Id.*

The CEO of Greencroft has affirmed in his affidavit that Evergreen Place is staffed with attendants who are available to residents twenty-four hours a day, every day [DE 31-1 at 1]. The attendants assist residents with dressing and transferring. *Id.* They also remind residents to take medication, assist with programming, housekeeping and laundry, and other support services as needed. *Id.* And while the attendants do not routinely bathe or assist with toileting, they are available for assistance with bathing and toileting if necessary. *Id.* Moreover, it is undisputed that Evergreen Place provides three meals a day and accommodates special dietary needs [DE 13 at 5].

The list of twenty-four hour a day services provided to Evergreen Place residents needing assistance is comparable to the Activities of Daily Living listed in the Policy. Moreover, Evergreen Place residents can contract for additional services as needed. Continental does not dispute the clarity of this portion of the Policy, nor does it contest the fact that these services are provided to Evergreen Place residents as needed. Instead, Continental offers an unsupported conclusory statement indicating the element is not satisfied. This is insufficient. Therefore, applying the plain meaning of the Policy, *see Reuille*, 888 N.E. 2d at 771, to the services undisputedly provided, Evergreen Place clearly meets the first element of Alternate Care Facility according to the Policy.

### C.      Licensed or accredited to provide such care.

The second contested issue is whether or not Evergreen Place meets the fourth element for Alternate Care Facilities. The Court finds that it does because it is uncontested that Evergreen Place itself has the appropriate licenses or accreditations to offer the care it provides.

By way of background, Indiana has several different kinds of health care facilities, such as Personal Service Agencies (*see* I.C. 16-27-4-5(a)), Comprehensive Care Facilities (*see* 410

Ind. Admin. Code 16.2-3.1-2), and Residential Care Facilities (*see* 410 Ind. Admin. Code 16.2-5-0.5).  Particular to this case, Greencroft has various divisions that are separately licensed or accredited and Evergreen Place patients may purchase additional services from these Greencroft divisions.  For instance, employees working for Greencroft at Home, licensed as a Personal Service Agency, and employees working for Greencroft Healthcare, licensed as a Comprehensive Care Facility, provide services that exceed the services which Evergreen Place attendants provide [DE 31-1 at 3, 14, 15].  Greencroft pays the employees who work for all three of these facilities—that is, Evergreen Place, Greencroft Healthcare, and Greencroft at Home.

In order to be considered an "Alternate Care Facility" under the Policy, Evergreen Place must be "licensed *or* accredited by the appropriate agency *to provide such care*, if . . . required by the state in which the care is received." [DE 31-4 at 8] (emphasis added).  In the instant case, Evergreen Place has complied with all licensing or accreditation requirements necessitated by Indiana for facilities that provide housing with services under Indiana Code 12-10-5 [DE 31-1 at 2].  Continental makes no assertion to the contrary.  Instead of arguing that Evergreen Place failed to comply with this applicable regulation, Continental asserts that in order for Evergreen Place's services to be covered under the Policy, Evergreen Place itself needed to comply with a separate regulation, 410 Ind. Admin. Code 16.2-5-0.5, which applies to Residential or Comprehensive Care Facilities.  Continental believes because Evergreen Place does not meet the licensure requirements of a Comprehensive or Residential Care Facility, Evergreen Place does not satisfy the fourth criteria in the Policy.  But Continental's argument reads additional requirements into the unambiguous text of the Policy.  The Policy could have included a particular kind of licensing or accreditation requirement for Alternate Care Facilities, but it does not.

The relevant clause does not specify a particular type of licensure or accreditation independent of the given level of licensure or accreditation required by the State. The plain terms of the text merely mandate that the facility be licensed or accredited to provide the care it provides to the extent the state requires it. Specifically, the text requires "licenses *or* accreditation." [DE 31-4 at 8] (emphasis added). Since this is phrased disjunctively, it indicates there is not a particular type of license or accreditation contemplated by the Policy. Further, the text also clearly indicates that the requirement pertains to "such care." *Id.* The phrase "such care" does not describe services the facility *might* provide, but rather the services the facility *actually* provides. If Evergreen Place provided the services a Residential or Comprehensive Care Facility provide, it would be required under the Policy to be licensed or accredited as such pursuant to Indiana law. This is not the case.

Continental relies on 760 Ind. Admin. Code s 2-20-31.1 in support of its arguments [DE 42 at 4], yet the language of this statute further confirms the Court's reading of the unambiguous Policy. This regulation explicitly authorizes an insurance company, such as Continental, the option to include a particular licensing requirement for an Alternate Care Facility: "[a] requirement that a residential care facility be licensed under IC 16-28 and 410 IAC 16.2-5 is optional for the issuer." *See* 760 Ind. Admin. Code 2-20-31.1. Yet this right was not exercised, and no such specified licensure requirement was placed in the Policy.[4]

---

[4] 410 Ind. Admin. Code 16.2-5-0.5(c) states:

> A facility that provides services, such as room, meals, laundry, activities, housekeeping, and limited assistance in activities of daily living, without providing administration of medication or residential nursing care is not required to be licensed. The provision by a licensed home health agency of medication administration or residential nursing care in a facility which provides room, meals, a laundry, activities, housekeeping, and limited assistance in activities of daily living does not require the facility to be licensed, regardless of whether the facility and the home health agency have common ownership, provided, however, that the resident is given the opportunity to contract with other home health agencies at any time during the resident's stay at the facility.

To the extent Evergreen Place residents need additional services or care that Evergreen Place attendants are unable to provide, those services are provided to Evergreen Place residents by employees of other Greencroft divisions at the Evergreen Place location. Indeed, the Policy does not prevent an insured from receiving care at a facility like Evergreen Place, while simultaneously contracting out for additional care, so long as the care is provided at Evergreen Place.

Thus, while Continental contends that Evergreen Place does not fulfill the regulations for Comprehensive and Residential Care Facilities, Evergreen Place is not required to do so according to the text of the Policy because state law does not require such licensure. Based on the record, Evergreen Place has the necessary licenses or accreditations for the services it provides to its residents. Therefore, Evergreen Place satisfies the fourth element of Alternate Care Facility.

**D.  Appropriate methods and procedures for handling and administering drugs and biologicals.**

The final dispute concerns whether or not Evergreen Place has "appropriate methods and procedures for handling and administering drugs and biologicals." [DE 31-4 at 8]. Continental argues Evergreen Place cannot qualify as an Alternate Care Facility because Indiana law forbids it from even handling and administering drugs and biologicals because it is not properly licensed as a Residential or Comprehensive Care Facility [DE 35 at 2, 5].

It is uncontested that Evergreen Place may not ignore Indiana law, and thus may not itself administer drugs. But Continental again conflates the Policy's requirements

---

This regulation explicitly allows residents of this type of facility to contract for additional services while not requiring the facility to comply with additional licensing requirements. This regulation resolves any argument by Continental that such a facility needs additional licensing.

with a particular kind of licensing under Indiana law. While it is common for facilities to administer medicine and biologicals to residents, the Policy stops short of explicitly requiring the administration of medicine or biologicals to meet the definition of an Alternate Care Facility. Rather, the focus of this clause is to ensure proper procedures and methods are in place, regardless of whether or not the facility actually handles and administers drugs.

In other words, the Policy only requires Evergreen Place to have *appropriate methods and procedures* in place for handling and administering drugs/biologicals. It does not require Evergreen Place *to actually handle and administer* drugs similar to a licensed facility in order to qualify as an Alternate Care Facility. *See e.g.,* 410 Ind. Admin. Code 16.2-1.1-4. Moreover, to the extent residents of Evergreen Place need to have assistance with the handling and administering of their medication, it is undisputed that Evergreen Place has procedures in place [DE 31-1 at 11-13], and Continental does not dispute the adequacy or appropriateness of these procedures.

Evergreen Place procedures include instructions for the attendants to remind residents to take medication [DE 31-1 at 11]. If a resident is unable to handle the medication, the attendants must place the medication in the hand of the resident. *Id.* The policy also prohibits Evergreen Place attendants from ever dosing the resident's medication. *Id.* at 12. Another policy describes the procedures for Evergreen Place attendants to apply skin patches to residents who have consented to having a non-medical person apply the patch [DE 31-1 at 13]. While one might argue over what it means to "handle and administer," this distinction is irrelevant because the Policy only requires that "appropriate methods and procedures" are in place. Here, the procedures in place

define the permissible means by which Evergreen attendants may administer and handle medication (to the extent they are allowed to do so by law). In addition, for those Evergreen Place patients who require additional assistance with handling and administering drugs that can only be provided by qualified employees of licensed facilities, the patient can contract with one of Greencroft's campus nurses to dispense medication and provide shots.

Again, Continental does not argue these procedures violate Indiana law nor does it argue that Evergreen Place needs additional or modified procedures. In fact, Continental agrees that the tasks Evergreen Place attendants perform relative to the dispensing of medication are "nothing more than any family member could perform at home" and also that Evergreen Place policies prohibit attendants from handling or administering medication [DE 35 at 6-7]. Thus, it is uncontested that Evergreen Place has procedures and methods in place regarding the handling and administering of drugs.

Instead, Continental argues for the implicit requirement that the facility must itself provide drugs and biologicals to residents to qualify as an Alternate Care Facility, yet this is not included in the Policy. The Policy language is clear and only requires *appropriate methods and procedures* for the handling and administering of drugs and biologicals. Evergreen Place has that. The Court would also note that Continental admits the provisions of the Policy are clear [DE 42 at 2], but then proceeds to take the Court through a labyrinth of state regulations arguing for their application even though they do not necessarily apply to Evergreen Place. Thus, the Court finds no merit in Continental's attempt to obfuscate the clear meaning of the Policy.

It is therefore appropriate for the Court to apply the plain meaning of the Policy to the final disputed element. *See Reuille*, 888 N.E. 2d at 771.  For the aforementioned reasons, the Court finds Evergreen Place satisfies the sixth element of Alternate Care Facility under the Long Term Care Insurance Policy issued by Continental.

## V.     CONCLUSION

Based on the foregoing, the Court DENIES Continental's Motion to Strike entirely and further STRIKES Continental's Counterclaim from the pleadings.  Greencroft of Goshen, Inc.'s facility known as Evergreen Place satisfies all of the elements in the Policy which define an Alternate Care Facility.  Thus, the Court GRANTS Christophel's Motion for Summary Judgment and DENIES Continental's Motion for Summary Judgment.  Since the parties' filings sufficiently addressed the issues raised by the pleadings and resolved herein, there is no need to have an oral argument, and therefore, the Court DENIES Continental's Motion for Oral Argument.

SO ORDERED.

ENTERED:  June 25, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court